UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| FRANKLIN AMERICAN MORTGAGE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 14-00753 |
| | ) | Judge Sharp |
| Chicago Financial Services, Inc., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the Court is the fully-briefed Motion for Summary Judgment (Docket No. 39), filed by Franklin American Mortgage Company ("FAMC"). For the reasons that follow, the Court finds in favor of FAMC on its breach of contract claim against Defendant Chicago Financial Services, Inc. ("CFS"), and will hold a jury trial on damages on the date already scheduled for trial.

## I. FACTUAL BACKGROUND

FAMC is a mortgage company; CFS originates, underwrites and funds mortgage loans and then sells them. In 2007, FAMC and CFS entered into a Correspondent Loan Purchase Agreement ("CLPA") and a Delegated Underwriting Agreement ("DUA") under which FAMC purchased residential mortgage loans originated by CFS.

On April 4, 2008, CFS originated a mortgage loan to borrower Coleman Newell that was underwritten in accordance with an agreement CFS then had with JP Morgan Chase Bank ("Chase"). CFS took a security interest in the property (a 3 bedroom/2 bath condominium) located at 4020 South Ellis Avenue Unit G, in Chicago, Illinois. That loan was sold to FAMC on August 14, 2008, under the terms of the CLPA, and it is that loan which serves as the basis for this lawsuit.

1

In applying for the loan, Newell repeatedly indicated that he would occupy the condominium. He did so by (1) completing an application which stated it would be his primary residence; (2) signing an Occupancy and Financial Status Affidavit under oath which indicated that he either occupied the property, or would do so within sixty days after signing the security instrument for the loan, and would continue to reside in the property for at least one year; and (3) signed a Borrower's Certification that stated he would occupy the property within a reasonable time after the closing of the loan. CFS relied on those documents in approving the loan.

When the loan was sold to FAMC, the Lock-In Confirmation Sheet stated that the property was owner occupied. However, Newell did not occupy the residence as promised. In fact, a signed lease agreement in the loan file suggest Newell rented the property to Curtis Harrison and Doris Banks on May 1, 2008, which was less than thirty days after the closing on the loan.

After purchasing the loan from CFS, FAMC sold it to Wells Fargo Funding, Inc. ("Wells Fargo"). On May 16, 2011, Wells Fargo sent FAMC an email regarding "misrepresentation of occupancy" in relation to the loan that stated a third party records check indicated that Newell "did not occupy the subject property following origination of the subject loan," and that a signed lease agreement showed the property being rented from Newell on May 1, 2008. The following day FAMC notified CFS of the issue identified by Wells Fargo and requested an explanation.

In a June 13, 2011 email response, Philip Brilliant, CFS's President, wrote that "[t]he closed loan documents include a lease for the subject unit dated within 30 days of the April 4, 2008 closing," but that he did "not have a reason why this lease was included with the application" because "[i]t contradicts the borrower's statement that he intended to live in the property as an owner occupied borrower." (Docket No. 40-2 at 5). Mr. Brilliant also wrote that because CFS does

"not service loans after a closing" it "was not given any indication as to [Newell's] actions over the course of the 12 month following his closing." (Id. at 6). A few days later, Mr. Brilliant sent another email in which he stated that CFS did not "knowingly write an owner occupied loan to Coleman Newell while knowing that [Newell] did not intend to move into the property"; that the loan was "re-engineered to be delivered to Franklin American" after Chase announced that it was cancelling its correspondence agreement with CFS; that "Newell had several rental properties at the time . . . and submitted 7 leases to [the] post closing department"; that the "post closing department did not study the leases or match them to the properties," but merely forwarded to FAMC "what the borrower sent in"; and that CFS was "innocen[t] in this situation." (Docket No. 40-1 at 25-26).

On July 20, 2011, Wells Fargo demanded that FAMC repurchase the Newell loan pursuant to the agreement between the parties. In turn, FAMC demanded that CFS either repurchase the loan outright, or pay a settlement amount lower than the repurchase price. CFS refused. Ultimately, FAMC entered into a settlement agreement with Well Fargo in which it repurchased the loan for a payment of $153,754.77.

CFS has not paid anything to indemnify FAMC for losses on the Newell loan, prompting this lawsuit for breach of contract.

## II. Standard of Review

The standard of review for motions for summary judgment is well known. A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); Covington v. Knox Cnty. Sch. Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. Application of Law

FAMC's breach of contract claim is based upon an alleged breach by CFS of a portion of Section 6 of the CLPA which in relevant part provides:

> **Section 6: Seller's Representations as to Mortgage Loans**
> At all times the Seller makes the following representations and warranties
> \*          \*          \*
> **6.2 There is no fact or circumstance with respect to the Mortgage** Loan that would entitle: a) an Agency to demand repurchase of a Mortgage Loan; b) an Agency or insurer to deny or reduce benefits under an insurance policy or guarantee; c) a third party, including but not limited to, an Agency and/or insurer, to claim indemnification or damages; or d) an Agency or other party deem a Mortgage Loan to be ineligible for a Pool. Each Mortgage Loan complies with the Agency Guide. The Seller is not now and has not within the last 24 months been subject to any administrative sanction imposed by an Agency.

(Docket No.1-1 at 13). FAMC's claim also alleges certain breaches of Section 8 of the CLPA, which provides in pertinent part:

> **Section 8: Mortgage Loan Repurchases**
> Seller agrees to repurchase one or more Mortgage Loans from Buyer, upon terms and conditions hereinafter set forth in the event that
> a) Any representation or warranty of Seller with respect to the Mortgage Loan is determined by Buyer to have been false or any other Event of Default with respect to the Mortgage Loan shall have occurred.
> b) Buyer is required to repurchase the Mortgage Loan after it has been sold to an Agency or a Private Investor due to a deficiency in or omission with respect to any documents, instrument, or agreement pertaining to the Mortgage Loan or because of any other defect which existed on or before purchase of the Mortgage Loan by Buyer or which arose after purchase as a result of an occurrence or omission on or before the purchase.

       &ast;       &ast;       &ast;

 f) A post-closing quality control review by Buyer, Agency or Private Investor discloses any material fraud or misrepresentation.

(Id. at 15).

 Those same provisions were the subject of an opinion by Judge Nixon of this Court in Franklin Am. Mortg. Corp. v. Direct Mortg. Corp., No. 3-11-00695 (M.D. Tenn. Aug. 20, 2013) ("Slip op.") where he found no ambiguity as to their terms. Prior to discussing that decision, however, the Court addresses some evidentiary issues raised by Defendant.

 In support of its Motion for Summary Judgment, FAMC relies upon various documents, including the lease between Newell, Curtis Harrison and Doris Banks, a Credit Report, and a Lexis Report. CFS argues that all of those documents are inadmissible because FAMC has not authenticated them and they are hearsay.

 With regard to authenticity, CFS argues FAMC has not authenticated the lease, noting that neither FAMC nor CFS was present when the lease was signed and neither party has knowledge of whether the lease is what it purports to be. Likewise, CFS argues that the Credit Report and Lexis Report have not been authenticated because the parties in this case did not prepare the document and there is no testimony in the record from anyone with personal knowledge from either Equifax or LexisNexis.

 "Federal Rule of Civil Procedure 56 requires the plaintiff to present evidence of evidentiary quality[.]" Perry v. Jaguar of Troy, 353 F.3d 510, 516 (6th Cir. 2003). "The proffered evidence need not be in admissible form, but its content must be admissible." Id. Therefore, "[a] party may object that the cited material to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

5

Here, CFS's argument is mis-focused. The question is not whether the lease and reports have already been authenticated. Rather, the issue is whether they can be presented in a form that is admissible at trial. See, Foreword Magazine, Inc. v. OverDrive, Inc., 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011) ("the 2010 amendments to Rule 56 . . . eliminated the unequivocal requirement that documents submitted in support of a summary judgment motion must be authenticated," and thus, " the objection contemplated by the amended Rule is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be").

Leaving aside that any of the signatories to the lease could authenticate it, the lease for the condominium was in the loan file that CFS submitted to FAMC, and Mr. Brilliant acknowledged in this deposition that the lease for the Newell property was submitted to CFS's post closing department. See, United States v. Komasa, 767 F.3d 151, 156-7 (2nd Cir. 2014) (holding that mortgage loan files may be self-authenticating documents); United States v. Lock, 411 Fed. App'x 5, 7 (7th Cir. 2010) (holding that court did not abuse its discretion in admitting contents of lending institution's loan files as certified domestic record under Fed. R. Evid. 902(11)). As for the reports, they may be authenticated by a custodian and made admissible as a business record. See, Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc., 2015 WL 1137572, at *1-2 (S.D.N.Y. Mar. 13, 2015) (noting that purpose of business record "rule is to ensure that documents were not created for personal purposes or in anticipation of any litigation so that the creator of the document had no motive to falsify the record in question," and holding that mortgage loan files that contained "documents created by originators, borrowers, and other third parties," including credit reports, were admissible as business records); Gannon v. IC Sys. Inc., 2009 WL 3199190, at *2 (S.D. Fla. Sept. 25, 2009) ("The Court's own research into the admissibility of credit reports under the business

record exception reveals that such reports are admissible when there is testimony from someone at the credit bureau with knowledge of how the reports are compiled").

Defendant next argues that (1) the lease "is hearsay because it is an out-of-court statement being offered for the truth of the matter asserted, *i.e.*, the Borrower did in fact contract with a tenant to lease the Property," and (2) "the Credit and Lexis Reports are out-of-court statements proffered for the truth of the matter asserted: that Equifax and Lexis-Nexis did not list the Property as the Borrower's primary residence." (Docket No. 143 at 8 & 10). CFS also asserts that Judge Nixon's opinion in "Direct Mortgage is inapposite because there was no challenge to the authenticity or admissibility of the records in that case." (Docket No. 43 at 13). CFS is incorrect on all counts.

Under the Federal Rules of Evidence, hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). However, "[a] statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay." Biegas v. Quickway Carriers, Inc., 573 F.3d 365, 379 (6th Cir. 2009). "Such a statement may be admitted to show why the listener acted as she did." United States v. Churn, 800 F.3d 768, 776 (6th Cir. 2015). Moreover, "Federal Rule of Evidence 803(3) provides an exception to the bar against hearsay for '[a] statement of [a] declarant's then-existing state of mind (such as motive, intent, or plan) . . . but not including a statement of memory or belief to prove the fact remembered or believed.'" Id (citation omitted).

Here, FAMC relied upon the lease and reports, not to establish that Newell in fact did not live in the condominium as promised. Rather, FAMC relied on those documents and others as a part of its investigation into the occupancy issue and came to believe that Newell had made

7

misrepresentations regarding his intent, as Wells Fargo claimed.

This conclusion is in keeping with Judge Nixon's ruling on a Motion to Reconsider in which defendant argued that the Court erred by relying on an Audit Report that was inadmissible hearsay. In addressing that assertion, Judge Nixon pointed out that "the Court did not rely on the report for its truth, but rather as evidence that [plaintiff] had reasons to believe there were misrepresentations in [the borrower's] loan application." Direct General, Slip op. at 11. He went on to observe:

> The actual finding of the Audit Report were not relevant to the Court's ruling. Rather the Court analyzed the Audit Report to assess its effects on FAMC's actions. The fact that the Audit Report stated that there were material inconsistencies in the loan application provided FAMC with reason to investigate further and to eventually determine, within its discretion, that repurchase was appropriate.

(Id. at 11). Likewise in this case, the lease and the reports gave FAMC reason to further investigate.

Turning to the merits, "[a] cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties." Christenberry v. Tipton, 160 S.W.3d 487, 494 (Tenn. 2005). In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent. Planters Gin Co. v. Fed. Compress & Warehouse Co., 78 S.W.3d 885, 889-90 (Tenn. 2002).

"Where the language of a contract is clear and unambiguous, its literal meaning controls the outcome of the dispute." Hood v. Jenkins, 2012 WL 4788636 at *7 (Tenn. Ct. App. Oct. 9, 2012). Where the language is ambiguous, however, the intention of the parties is discerned "'not alone from the language of the contract, but also from the surrounding facts and circumstances.'" Id. (quoting HMF Tr. v. Bankers Tr. Co., 827 S.W.2d 296, 299 (Tenn. Ct. App. 1991) (quoting, Nat'l Garage Co. v. George H. McFadden & Bro., Inc., 542 S.W.2d 371 (Tenn. Ct. App. 1991)); see Cummings, Inc. v. Dorgan, 320 S.W.3d 316, 333 (Tenn. Ct. App. 2009) ("When a contract is ambiguous and it

is necessary to consider extrinsic evidence to properly interpret the contract, the issue becomes a mixed question of law and fact").

As noted, Judge Nixon in Direct General found no ambiguity with respect to the very sections of the CLPA at issue in this case. With respect to Section 6.2, he wrote that "[t]he section plainly states that if any fact or circumstance exists that entitles an agency or insurer to demand repurchase, deny or reduce insurance benefits, or claim indemnification or damages, Direct will be in breach of its representations or warranties." (Direct General Slip op. at 9). As for Section 8(a), he found that "the language of this section is not ambiguous as the plain reading of 'determined by [FAMC]' can only reasonably be understood to indicate that FAMC retains discretion to decide whether any of Direct's representations or warranties are false." (Id. at 13). With regard to Section 8(b), he found "no ambiguity in the interpretation of this section as the plain language states Direct is obligated to repurchase a loan if FAMC is required to repurchase it from a third party based on a defect or omission that existed prior to FAMC's original acquisition of the loan." (Id. at 15). Finally, Judge Nixon found "the language in Section 8(f) to be unambiguous in creating a broader obligation to repurchase mortgage loans than the provision in Section 6.2, in that Section 8(f) requires Direct to repurchase a loan if an audit reveals *any material fraud or misrepresentations* relating to the loan," and "[t]he language of this provision clearly obligates Direct to repurchase loans regardless of who is responsible for making material misrepresentations or what the material misrepresentations concern." (Id. at 16, italics in the original).

This Court agrees with Judge Nixon's analysis and conclusions and finds that, in accordance with the terms of the CLPA, CFS was required to repurchase the Newell loan. In so doing, the Court has considered the arguments raised by CFS, but finds them to be unpersuasive.

9

CFS claims that FAMC's position it that "it has sole and unfettered discretion to declare Events of Default, and that its determination governs even if it inaccurate or arbitrary." (Docket No. 43 at 13). CFS insists this "is not the law in Tennessee as shown by" Direct General which "explains that Franklin's discretion is bounded by the implied duty of good faith and fair dealing in the CLPA, imposing a duty upon Franklin to deal with CFS fairly and reasonably." (Id. 13-14). CFS continues:

> Here, the only evidence Franklin provides in support of its breach determination is unauthenticated, inadmissible hearsay. . . . Franklin's conduct is not commercially reasonable and it cannot seek summary judgment based upon unauthenticated, inadmissible evidence that Franklin never bothered to question or investigate. Moreover, whether a party acted in good faith is a question of fact. . . . Whether Franklin abused its discretion to CFS' detriment is a question of fact.

(Id. at 13, internal citation omitted).

"In Tennessee, a duty of good faith and fair dealing is imposed in the performance and enforcement of every contract." Lamar Adver. Co. v. By-Pass Partners, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009) (citing Wallace v. Nat'l Bank of Commerce, 938 S.W.2d 684, 686 (Tenn.1996)). "The purpose of this implied covenant is (1) to honor the reasonable expectations of the contracting parties and (2) to protect the rights of the parties to receive the benefits of the agreement into which they entered." Id.

"'[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact.'" Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc., 395 S.W.3d 653, 671 (Tenn. 2013) (quoting 23 Richard A. Lord, WILLISTON ON CONTRACTS § 63:22 (4th ed. 2002). "The duty of good faith, however, does not extend beyond the terms of the contract and the reasonable expectations of the parties under the contract." Regions Bank v. Thomas,

10

422 S.W.3d 550, 560 (Tenn. Ct. App. 2013) Nor can the duty "create additional contractual rights or obligations," or "be used to avoid or alter the terms of an agreement." Id.

It is true, as CFS argues, that Judge Nixon recognized the duty of good faith and fair dealing imposed in all contracts. However, he also found that (1) "FAMC's discretion to determine that Direct has breached a warranty or representation under Section 6.2 must coincide with Direct's reasonable expectations in entering into the contract in order to satisfy FAMC's duty of good faith and fair dealing"; (2) "section 8 contains a list of circumstances that trigger Direct's promise to repurchase," including an agreement to repurchase "in the event that FAMC determines any of Direct's warranties or representations regarding a mortgage loan are false"; and (3) based on an "audit report and Direct's failure to refute the report's findings, . . . FAMC fairly and in good faith exercised its discretion to determine that at least one of Direct's warranties or representations under Section 6.2 was false." Direct General, Slip op at 14.

So too here: FAMC gave CFS over two months to provide information to overcome Wells Fargo's repurchase demand, yet CFS provided no such information. In fact, CFS never challenged the determination that the borrower did not occupy the condominium, and to date has provided nothing which would suggest that Newell ever occupied the residence. Since the parties voluntarily entered into an agreement which states that FAMC retains the discretion to determine when CFS's representations and warranties were false, and since the CLPA contains no language which would require FAMC to actually prove that it was correct in its determination, CFA, "upon executing this contract, should have reasonably expected" (id.) FAMC's demand to repurchase the Newell loan in light of the "determined by the Buyer" language in Section 8(a).

CFS next argues that FAMC "cannot prove that the Borrower misrepresented his intent to

11

occupy the property" as of that date of closing, pointing out that some of the loan documents "contained language regarding the Borrowers 'intent' to occupy the Property, and also include an extenuating circumstances clause releasing the Borrower from the occupancy obligation." (Docket No. 43 at 13-14). This may be so, but it neglects to consider that the Lock-In Confirmation Sheet completed by CFS indicates it was an owner-occupied loan, and the borrower's application and occupancy affidavit sent by CFS to FAMC as required by the CLPA indicated that Newell would reside in the residence. Given what developed, it was certainly reasonable for FAMC to conclude that these representations were not true. CFS's contention that "the Borrower could have been entirely honest in stating a subjective intent to occupy the Properly but then experienced a hardship that forced him to arrange for the lease" (id. at 14), is nothing but speculation and insufficient to survive summary judgment. See, Lewis v. Philip Morris, Inc., 355 F.3d 515, 533 (6th Cir.2004) (internal quotation marks and citation omitted) ("In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy.").

CFS further argues that FAMC "committed the first material breach by purchasing the Loan more than 60 days after it closed, with notice it was an 'old' loan, and without reviewing the loan." It then quotes Forrest Constr. Co. LLC v. Lauglin, 337 S.W.3d 211, 224 (Tenn. Ct. App. 2009) for the proposition that "[w]hether a party has fulfilled its obligations under contract or is in breach of the contract is a question of fact." However, in its Memorandum opposing Summary Judgment, CFS does not point to any provisions in the CLPA that requires FAMC to either review old loans or avoid purchasing them. In its statement of facts, CFS cites Section 2 of the CLPA, but all that section does is impose certain obligations on the "Seller" (read CFS), such as selling only current non-delinquent

loans – it imposes no obligation on FAMC. It reads:

> **Section 2: Loans Eligible for Purchase**
>
> The Seller will offer to sell Mortgage Loans on a service released basis that are: a) closed no more than 60 days before the Purchase Date; b) current; c) without a history of delinquent principal, interest, or escrow payments; d) approved, funded and closed by and in the name of the Seller or the Seller's approved Third Party Originator; and e) originated, delivered ans serviced in accordance with Agency Guides, the Manual, Applicable Requirements, and any additional Agency and Buyer conditions.

(Docket No.1-1 at 12).

Finally on the issue of liability, CFS presents a wholly underdeveloped waiver argument. Leaving aside a quotation to the Tennessee Pattern Instruction which serves as its sole authority, the entirety of CFS's argument is a follows:

> Whether Franklin has waived, or should be estopped from, declaring an event of default and demanding CFS indemnify it for purported losses on the Newell Loan where it purchased the Loan with knowledge that it breached § 2 of the CLPA, and has been underwritten to Chase guidelines different from Franklin's, is a question of fact.

(Docket No. 43 at 16-17).

Tennessee law surrounding waiver, that is, "a voluntary relinquishment by a party of a known right," Reed v. Wash. Cnty. Bd. of Educ., 756 S.W.2d 250, 255 (Tenn.1988), has been summarized as follows:

> Waiver may be either express or implied. Reed, 756 S.W.2d at 255. "An express waiver is an oral or written statement giving up known rights or privileges." Grimsley v. Kittrell, No. M2005–02452–COA–R3–CV, 2006 WL 2846298, at *3 (Tenn. Ct. App. Sept. 29, 2006). An implied waiver, which in Tennessee appears to be synonymous with the doctrine of equitable estoppel in the context presented here, requires the following elements: "(1) [l]ack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such character as to change his position prejudicially." Reed, 756 S.W.2d at 255. "[I]t is well-settled that an implied waiver will not be presumed. Rather, the party asserting waiver bears the burden of

13

> proving that the party against whom waiver is asserted has, by a course of acts and conduct, or by so neglecting and failing to act, ... induce[d] a belief that it was the party's intention and purpose to waive." BMG Music v. Chumley, No. M2007–01075–COA–R9–CV, 2008 WL 2165985, at *5 (Tenn. Ct. App. May 16, 2008) (citing Ky. Nat'l Ins. Co. v. Gardner, 6 S.W.3d 493, 499 (Tenn.App.1999)). "In order to establish waiver by conduct, the proof must show some absolute action or inaction inconsistent with the claim or right waived." Id.

Productive MD, LLC v. Aetna Health, Inc., 969 F. Supp. 2d 901, 926 (M.D. Tenn. 2013). Given this law, CFS's waiver argument is, as FAMC observes, "simply untenable."

There is not any suggestion, let alone a scintilla of evidence, that FAMC expressly or impliedly waived its remedies under the CLPA by purchasing the Newell loan. Rather, the record shows that when the parties entered into the CLPA, FAMC performed its obligation to perform by paying the purchase price and, thereby, showed an intent to be bound to the terms and to be able to take advantages of the CLPA, including its remedies. Further, CFS presents no evidence to suggest that it did not know (or could not learn) whether FAMC intended to asserts its rights under the FAMC. To the contrary, the evidence before the Court shows FAMC alerted CFS to the issues and provided CFS with an opportunity to adequately explain the Newell discrepancy or pay the demand made by Wells Fargo.

Turning to the question of damages, the Court finds material questions of fact that preclude summary judgment, particularly as they relate to mitigation. While FAMC paid what it claims to have been a substantially reduced settlement ($153,754.77) that allegedly saved CFS over $129,000, whether that amount was reasonable presents a question only a jury can answer, particularly since Wells Fargo received the property to do with it what it wanted, and FAMC did not ask Wells Fargo to decrease the amount to account for the existence of mortgage insurance. See Multimedia 2000, Inc. v. Attard, 374 F.3d 377, 382 (6th Cir. 2004) (citation omitted) (stating that it "is a well

established rule in Tennessee that the party injured by the wrongful act of another has a legal duty to exercise reasonable and ordinary care under these circumstances to prevent and diminish the damages" and this "frequently involves a determination as to whether the [injured party] acted reasonably under the circumstances" making it a "question of fact").

This conclusion remains notwithstanding FAMC's reliance on Carolyn B. Beasley Cotton Co. v. Ralph, 59 S.W.3d 110, 115 (Tenn. Ct. App. 2000) as authority for the proposition that the duty to mitigate arises only after a breach occurred because that case also states that "the exact moment of the breach is a question of fact." It could be that the breach occurred after CFS refused FAMC demand for repurchase or indemnification which was after FAMC and Wells Fargo entered their settlement agreement. But it could also be that the breach of the CLPA occurred when CFS sold FAMC the non-confirming loan, or at least when FAMC learned from Well's Fargo that the loan was non-conforming and CFS refused to address the matter. Moreover, given that every contract requires good faith and fair dealing, it may have been incumbent upon FAMC to attempt to mitigate damages when it anticipated CFS breach or repudiation of its obligations under the CLPA. See, APS Capital Corp. v. Mesa Air Group, Inc., 580 F.3d 265, 274 (5th Cir. 2009) (stating that party is "entitled to endeavor to salvage the contract before beginning to mitigate," but that once repudiation occurs, party is "obligated" to mitigate); Ind. Mich. Power Co. v. United States, 422 F.3d 1369, 1375 (Fed. Cir. 2005) ("Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage"); R.M. Railcars LLC v. Marcellus Energy Servs., LLC, , 2015 WL 4508451, at *3 (N.D.N.Y. July 24, 2015) (citation omitted) ("A duty to mitigate damages arises when (1) a contract is breached and (2) it appears that the breaching party has abandoned or repudiated his obligations under the contract").

15

## IV. Conclusion

For the foregoing reasons, FAMC's Motion for Summary Judgment will be granted as to liability, but its request for summary judgment on the damages issue will be denied.

An appropriate Order will be entered.

*[signature]*
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE